FILED

04/06/2022

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
November 2, 2021 Session

**STATE OF TENNESSEE v. TARRANCE JERSHUN PERRY**

**Appeal from the Circuit Court for Madison County**
**No. 19-948   Donald H. Allen, Judge**

_____

**No. W2020-01464-CCA-R3-CD**

_____

The Appellant, Tarrance Jershun Perry, was convicted in the Madison County Circuit Court of rape, a Class B felony, and the trial court sentenced him to fifteen years to be served at one hundred percent release eligibility.  On appeal, the Appellant contends that a constructive amendment of the indictment and a fatal variance occurred when the indictment charged him with rape by force or coercion but the proof at trial showed rape without consent and that the evidence is insufficient to support the conviction.  Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and TIMOTHY L. EASTER, J., joined.

Kendall Stivers Jones, Assistant Public Defender-Appellate Division (on appeal), Franklin, Tennessee, and Greg Gookin (at trial), Jackson, Tennessee, for the appellant, Tarrance Jershun Perry.

Herbert H. Slatery III, Attorney General and Reporter; Samantha L. Simpson, Assistant Attorney General; Jody Pickens, District Attorney General; and Shaun A. Brown, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

In December 2019, the Madison County Grand Jury indicted the Appellant for rape by force or coercion and violating the sex offender registry law.  The trial court severed the offenses, and the Appellant proceeded to trial for rape in July 2020.

At trial, the fifteen-year-old victim testified that in the fall of 2018, she was thirteen years old and was living in a home on Lost Creek Road with her siblings, her mother, her mother's boyfriend, and the Appellant. The Appellant had been living with the victim's family for a couple of months.

The victim testified that one night in November, she was asleep on the floor in her older brother's upstairs bedroom. The victim's older brother, Q.V., was not present, but the victim's two-year-old brother, J.J., was asleep in Q.V.'s bed.[1] The victim's mother was at work, and the victim's other siblings were asleep downstairs. The victim said that the Appellant "shook" her to wake her, that he moved her shorts to the side, and that he started to penetrate her vagina with his penis. The victim stated, "I told him to stop. He ain't stopped. I pushed him. He didn't get off me." The Appellant penetrated the victim. The State asked if the victim wanted "that" to happen and if she gave the Appellant permission to do "that." The victim answered both questions in the negative. The Appellant did not hit the victim, but the penetration was painful. The Appellant did not say anything to the victim when he woke her, and J.J. remained asleep during the incident. The victim said she did not scream because the Appellant "had the radio on." After the incident, the victim went into the bathroom and used the bathroom. When she wiped her vaginal area, she saw blood.

The State asked why the victim did not tell anyone, and she testified that "he said he was going to hurt [himself] and me, if I did." However, in December or January, the victim's mother took her to a hospital, and the victim told nurses and her mother what had happened. The victim also drew a picture for law enforcement, showing the layout of the bedroom in which the incident had occurred. The State showed a drawing to the victim, and she identified it as the one she made after she revealed the abuse. At the close of the victim's direct examination, the following colloquy occurred:

> Q     And did you give him permission to do that?
>
> A     No.
>
> Q     Was that with your consent?
>
> A     No.
>
> Q     Was it against your will that he did that?
>
> A     Yes.

---

[1] In order to protect the victim's identity, we will refer to her siblings and her mother by their initials.

Q       You need me to rephrase the question?  Did you want him to do that?

A       No.

Q       Did he have your permission to do it?

A       No.

Q       When I said earlier, "against your will," that means you didn't want him to do it; is that correct?

A       Yes.

On cross-examination, the victim testified that she had two older siblings and five younger siblings.  The Appellant usually slept in Q.V.'s bed with Q.V.  On redirect-examination, the State asked why the victim slept in Q.V.'s bedroom that night, and the victim answered, "I don't know. . . . [E]verybody sleep in each [other's] rooms."

T.C., the victim's mother, testified that she had eight children ranging in age from seven months to twenty-one years old.  The victim was her third child.  In November 2018, T.C.'s family and T.C.'s boyfriend were living in a house on Lost Creek Road.  They had moved into the home in July or August.  The house had four bedrooms, and Q.V.'s bedroom was upstairs.  T.C. said that the children had assigned bedrooms but that they slept "all over the place."

T.C. testified that the Appellant was her best friend's brother.  About one month after T.C.'s family moved into the home on Lost Creek Road, the Appellant told T.C. that he was "going through some things" and that he needed a place to stay.  The Appellant asked to live with T.C. and told her that he would "help out around the house, help out with transportation, and help with the kids."  T.C. was working from 7:00 p.m. to 7:00 a.m. most days, so she allowed the Appellant to move into her home.

T.C. testified that at some point, she told the Appellant that her children were "feeling uncomfortable with him."  The Appellant argued with T.C., so she asked him to leave, and he did so.  In December or January, T.C. saw some text messages between the Appellant and the victim.  As a result of the messages, T.C. took the victim to a hospital emergency room and learned that something had happened between the Appellant and the victim.

On cross-examination, T.C. testified that the Appellant was unemployed and that he slept in Q.V.'s bedroom or on the living room couch.  T.C. said she did not remember a

radio being in Q.V.'s bedroom. She acknowledged that the victim did not tell her about the Appellant's vaginally penetrating the victim.

Sergeant T.J. King of the Madison County Sheriff's Office testified that on December 29, 2018, the victim went to a hospital emergency room and disclosed that she had been sexually assaulted in a home on Lost Creek Road. Sergeant King later met the victim and her mother. On January 17, 2019, the victim had a forensic interview at the Center for Child Abuse.

On cross-examination, Sergeant King testified that he was present in a separate room during the victim's forensic interview but that he could hear and see her. Although Sergeant King met the victim and her mother, he did not speak with them about the incident on Lost Creek Road.

At the conclusion of Sergeant King's testimony, the State rested its case. The Appellant did not present any proof, the parties gave their closing arguments, and the trial court instructed the jury. During deliberations, the jury sent a note to the trial court, stating that the jurors were unable to reach a unanimous decision. The trial court had the jury brought into the courtroom and asked the foreperson if she thought further deliberations would result in a unanimous verdict. She answered, "Probably." However, she then answered, "No, not really. . . . They said it wasn't enough evidence." The trial court questioned some of the jurors, and one of them said he thought it was possible they could reach a unanimous verdict. Another juror asked the trial court, "[W]e are required to accept the statement that is given under oath as fact, correct?" The trial court responded, "[Y]ou each judge the credibility or believability of the witness. That's your role. That's your job to determine whether or not they're telling the truth or not telling the truth. I mean, that's -- that's your role. Understand?" The trial court sent the jury out of the courtroom to continue deliberations. Subsequently, the jury returned to the courtroom and pronounced the Appellant guilty of rape, a Class B felony. The trial court polled the jury, and each juror confirmed the verdict. On September 8, 2020, the trial court held a sentencing hearing and sentenced the Appellant to fifteen years to be served at one hundred percent.

## II. Analysis

### A. Fatal Variance

The Appellant contends that a constructive amendment of the indictment and a fatal variance occurred when the indictment charged him with rape by force or coercion but the proof at trial showed rape by lack of consent. In support of his argument, he notes that during the victim's direct examination, the State repeatedly questioned her as to whether she consented to the penetration. He also notes that during the State's closing argument, the State "completely misstated the statutory elements" of the charged offense by telling the jury that force or coercion meant without consent. The Appellant asserts that the State's

- 4 -

direct examination of the victim and improper closing argument "broadened the grounds for conviction and changed the nature of the essential elements of the offense." The State argues that the Appellant has waived this issue for failing to object to the victim's testimony and the State's closing argument at trial and for failing to raise the variance issue in his motion for new trial. The State also argues that, absent waiver, this court has "[i]mpliedly . . . considered force and consent to be [synonymous]." We disagree with the State on both points. That said, we conclude that a constructive amendment of the indictment and a fatal variance did not occur in this case.

As to the State's waiver argument, the State is correct in that the Appellant did not object to the victim's testimony or the State's closing argument. See Tenn. R. App. P. 36(a) (nothing in the rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error). The Appellant also did not raise the variance issue in his motion for new trial. Ordinarily, we treat an issue not included in a motion for new trial as waived pursuant to Tennessee Rule of Appellate Procedure 3(e), which provides that "in all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence . . . unless the same was specifically stated in a motion for a new trial."

As noted by the Appellant, though, "When a variance occurs, the proof is insufficient, as a matter of law to support the offense alleged in the charging instrument. . . . Since the relief to be granted when a variance occurs is the dismissal of the prosecution, the waiver provision contained in Rule 3(e) is not applicable." State v. Keel, 882 S.W.2d 410, 417 (Tenn. Crim. App. 1994); see State v. Boxley, 76 S.W.3d 381, 390 (Tenn. Crim. App. 2001) (sufficiency of the evidence does not have to be raised in a motion for new trial in order to be heard on appeal). Therefore, we will consider the Appellant's variance issue.

Relevant to this case, rape is unlawful sexual penetration of a victim by the defendant when (1) force or coercion is used to accomplish the act or (2) the sexual penetration is accomplished without the victim's consent and the defendant knows or has reason to know at the time of the penetration that the victim did not consent. Tenn. Code Ann. § 39-13-503(a)(1), (2). Here, the indictment alleged that the Appellant sexually penetrated the victim "by use of force or coercion." During the State's direct examination of the victim, the State asked several times if she consented to the penetration. Moreover, during the State's closing argument, the State said as follows:

> She told him no, this is not what she wanted to happen. She told you that. This is not what she wanted to happen. She was wearing a t-shirt and shorts and that he pulled her shorts to the side, and inserted his penis into her vagina. That's penetration. She told you it was against her will. It was without her consent.

- 5 -

. . . .

But, ladies and gentlemen, what you're here about is -- is a terrible crime, a terrible charge, but a fairly simple charge in that rape is the unlawful sexual penetration of a person to another person by force or coercion, which means basically without their will, without their consent. You just can't sexually penetrate somebody unless they consent to it.

[The victim] told you she did not consent to it, that he came in there and woke [her up], trying to penetrate her. He was able then to actually do that, to actually sexually penetrate her with his penis into her vagina, which is rape. It was against her will, without her consent, and without her permission. That is rape.

. . . .

So, I ask you, ladies and gentlemen, take the -- the one piece of evidence that you have, just so you can see the layout of the room. You're going to listen to the testimony and recall the testimony that you -- you've heard today regarding what happened, what [the victim] told you, that this was without her consent and against her will.

After closing arguments, the trial court instructed the jury that the essential elements of rape were "(1) That the defendant had unlawful sexual penetration of the victim; and (2) That force or coercion was used to accomplish the act; and (3) That the defendant acted either intentionally, knowingly, or recklessly." The trial court defined "force" as "compulsion by the use of physical power or violence" and defined "coercion" as "the threat of force or violence to be performed immediately or in the future."

The Sixth and Fourteenth Amendments to the United States Constitution and article I, section 9 of the Tennessee Constitution afford an accused the right to be informed of the nature and cause of the accusation against him or her. See State v. Hill, 954 S.W.2d 725, 727 (Tenn. 1997). A valid indictment "must provide a defendant with notice of the offense charged, provide the court with an adequate ground upon which a proper judgment may be entered, and provide the defendant with protection against double jeopardy." State v. Byrd, 820 S.W.2d 739, 741 (Tenn. 1991). "[N]ot only must the government prove the crime it charges, it must charge the crime it proves." State v. Goodson, 77 S.W.3d 240, 244 (Tenn. Crim. App. 2001). Moreover, "after an indictment has been returned, its charge may not be broadened or changed except by action of the grand jury." Id.

As this court recently explained,

A variance results when the evidence at trial does not correspond to the elements of the offense alleged in the charging instrument. [Keel, 882 S.W.2d at 416]. In many such cases, the evidence establishes the commission of an offense different from the offense alleged in the charging instrument. See id. The variance rule is predicated upon the theory that an accused cannot be charged with one offense and convicted of a completely different offense. See id. A variance is not fatal unless it can be "deemed to be material and prejudicial." State v. Moss, 662 S.W.2d 590, 592 (Tenn. 1984). A variance will not be deemed material and prejudicial in cases where "the allegations and proof substantially correspond, the variance is not of a character which could have misled the defendant at trial and is not such as to deprive the accused of his right to be protected against another prosecution for the same offense." Id. Related to a variance, a constructive amendment of the indictment occurs "when the jury is permitted to convict the defendant upon a factual basis that effectively modifies an essential element of the offense charged." [Goodson, 77 S.W.3d at 244]. When a constructive amendment occurs, reversal is said to be "automatic, because the defendant may have been convicted on a ground not charged in the indictment." Id. The logic is that a constructive amendment of the indictment, not consented to by the defendant, does not accomplish the "overriding purpose of notice to the accused" required of an indictment. See State v. Hammonds, 30 S.W.3d 294, 300 (Tenn. 2000).

State v. Jay W. Edwards, No. E2019-02176-CCA-R3-CD, 2021 WL 2554217, at *16 (Tenn. Crim. App. at Knoxville, June 22, 2021), perm. app. denied, (Tenn. Nov. 17, 2021).

In Goodson, the defendant was indicted for driving a motor vehicle on a revoked license, but the proof at trial showed that he was driving on a suspended license. 77 S.W.3d at 244-45. The statute at issue made it a crime to drive with a cancelled, suspended, or revoked license. See Tenn. Code Ann. § 55-50-504(a)(1). This court found that driving on a license that was cancelled, suspended, or revoked constituted three separate offenses. Id. at 244. Additionally, this court found that while the words "suspended" and "revoked" often were used interchangeably, they had different meanings pursuant to Tennessee Code Annotated section 55-50-102(42), (47) (1998), which defined "[r]evocation" and "[s]uspension" of a driver's license. Id. at 245. Accordingly, this court concluded that a constructive amendment of the indictment occurred and reversed the defendant's conviction of driving on a revoked license. Id.

The State contends that the words "force or coercion" and "consent" are related concepts that prove the elements of rape. We agree. As this court has recognized, "In most rape cases, the 'lack of consent' element is associated with the victim being forced or coerced into the sexual acts." State v. Raymond Mitchell, No. 1996-00008-CCA-R3-CD, 1999 WL 559930, at *6 (Tenn. Crim. App. at Nashville, July 30, 1999). However, "[t]his

- 7 -

Court presumes that the General Assembly used each word in a statute deliberately, and that the use of each word conveys a specific purpose and meaning." State v. Strode, 232 S.W.3d 1, 11 (Tenn. 2007). "Accordingly, we 'must give effect to every word, phrase, clause, and sentence in constructing a statute.'" Id. (quoting State v. Jennings, 130 S.W.3d 43, 46 (Tenn. 2004)). Our Code defines "force" as "compulsion by the use of physical power or violence" and "coercion" as "threat of kidnapping, extortion, force or violence to be performed immediately or in the future or the use of parental, custodial, or official authority over a child less than fifteen (15) years of age." Tenn. Code Ann. §§ 39-11-106(a)(12), -13-501(1). "All of the sexual assault crimes contemplate the lack of effective consent by the victim." State v. Ealey, 959 S.W.2d 605, 611 (Tenn. Crim. App. 1997). "Effective consent" means "assent in fact, whether express or apparent, including assent by one legally authorized to act for another. Consent is not effective when [it is] [i]nduced by deception or coercion." Tenn. Code Ann. § 39-11-106(a)(9).

In this case, the State charged the Appellant with rape by force or coercion, not rape by lack of consent, but referred to the two theories of rape interchangeably. Unlike the State in Goodson, though, the State in this case introduced evidence of rape by force as alleged in the indictment. The victim testified that she told the Appellant to stop, that she pushed him, and that he would not get off of her. Moreover, after the proof and closing arguments, the trial court properly instructed the jury on rape by force or coercion; the trial court did not instruct the jury on rape by lack of consent or define "consent." We note that the trial court also instructed the jury that "[s]tatements, arguments, and remarks of counsel are intended to help you in understanding the evidence and applying the law, but they are not evidence." Generally, we presume that a jury has followed the trial court's instructions. See State v. Butler, 880 S.W.2d 395, 399 (Tenn. Crim. App. 1994). Therefore, we conclude that a constructive amendment of the indictment and a fatal variance did not occur in this case and that the Appellant is not entitled to relief.

### B. Sufficiency of the Evidence

In a related argument, the Appellant contends that the evidence is "devoid of any proof" that he used force or coercion to accomplish the penetration. The State argues that the proof shows both force and coercion. We conclude that the evidence is sufficient to support the conviction.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well

as all factual issues raised by the evidence, are resolved by the trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. Id. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

A guilty verdict can be based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting Marable v. State, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)).

As stated previously, rape as charged in this case is unlawful sexual penetration of a victim by the defendant when force or coercion is used to accomplish the act. Tenn. Code Ann. § 39-13-503(a)(1). "'[F]orce' means compulsion by the use of physical power or violence and shall be broadly construed to accomplish the purposes of this title." Tenn. Code Ann. § 39-11-106(a)(12). "'[C]oercion' means threat of kidnapping, extortion, force or violence to be performed immediately or in the future or the use of parental, custodial, or official authority over a child less than fifteen (15) years of age." Tenn. Code Ann. § 39-13-501(1).

First, the Appellant contends that while there was substantive proof that he penetrated the victim, there was no substantive proof that he used physical force to do so. However, the victim, a thirteen-year-old female, testified that the Appellant was on top of her, that she told him to stop, and that she tried to push him away. The Appellant, a grown man, refused to get off of the victim and penetrated her.[2] The victim said that the penetration hurt and that she bled afterward. Taken in the light most favorable to the State, the evidence shows that the victim resisted the Appellant. Therefore, we have no hesitation in concluding that the Appellant used force to accomplish the penetration.

The Appellant also contends that the proof fails to show coercion because his threat to harm himself and the victim occurred after the penetration was completed. The State

---

[2] According to the Appellant's presentence report, which was prepared in September 2020, the Appellant was forty years old and weighed one hundred seventy-five pounds. Although the State did not present evidence of the Appellant's age and weight at trial, the jury was able to view him in the courtroom.

argues that because the victim never said when the threat occurred, a reasonable jury could infer that he made the threat for the purpose of accomplishing the rape.

The rape statute provides that the coercion must be used "to accomplish the act," and it was the State's burden to prove coercion beyond a reasonable doubt. The victim testified that the Appellant woke her by shaking her. The State asked if he said anything to her when he woke her, and she said no. The victim did not say that the Appellant made any threat to her before or during the penetration. The State later asked her why she did not tell anyone about the rape, and she said the Appellant threatened to harm himself or her. Therefore, we think that it was reasonable for the jury to infer that the threat occurred after the act, not to accomplish the act. In any event, the evidence is sufficient to support his conviction of rape by force.

### III.  Conclusion

Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgment of the trial court.

                      _____

                      NORMA MCGEE OGLE, JUDGE