IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs March 13, 2024

## STATE OF TENNESSEE v. JEREMIE SCOTT MODINE

**Appeal from the Circuit Court for Maury County**
No. 28575    Stella L. Hargrove, Judge

_____

**No. M2022-01183-CCA-R3-CD**

_____

A Maury County jury convicted Defendant, Jeremie Scott Modine, of one count of rape, one count of domestic assault, three counts of violating a no-contact order, and two counts of violating a protective order. Defendant argues on appeal that (1) the trial court committed plain error in constructively amending the indictment to charge rape by lack of consent, and (2) that the trial court erred in denying alternative sentencing. After careful consideration, we hold that the trial court committed plain error in constructively amending the indictment by instructing the jury on a mode of liability not charged in the indictment. The trial court did not abuse its discretion in denying alternative sentencing. We therefore vacate Defendant's rape conviction and remand this matter for a new trial on that count of the indictment as well as correction of judgment forms as outlined in this opinion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Vacated in Part, Affirmed in Part, Conviction Vacated, Case Remanded**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., J., and CAMILLE R. MCMULLEN, P.J., joined.

Brennan M. Wingerter (on appeal), Assistant Public Defender – Appellate Director, Franklin, Tennessee; and William Chase Rudd (at trial), Nashville, Tennessee, for the appellant, Jeremie Scott Modine.

Jonathan Skrmetti, Attorney General and Reporter; Abigail H. Rinard, Assistant Attorney General; Brent A. Cooper, District Attorney General; and Kyle E. Dodd, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### *Factual and Procedural History*

Defendant and the victim, J.M.,[1] were married in 2010. They had five children together.

In April 2020, Defendant and the victim resided in a home on Old Highway 99 in Columbia along with their children. The victim's parents and the victim's teenage brother lived with Defendant and the victim's family. The victim's parents and brother stayed in the basement, and Defendant, the victim, and their children stayed on the ground floor. Defendant was gone for days and sometimes weeks at a time with his job in construction.

Defendant and the victim's marriage deteriorated. Defendant began using drugs "pretty frequently" with his sister in late 2019. Defendant's drug use "[c]aused a lot of arguments" between him and the victim. Unbeknownst to Defendant, the victim filed for divorce on April 3, 2020, before he returned from a work trip. The victim was scared of Defendant, so rather than telling him she had filed for divorce, her divorce attorney advised her to "let him be served."

Defendant had recently celebrated his birthday on April 1. Because Defendant was gone for work on his birthday, the victim and their children made Defendant lasagna on April 3 and planned to give it to him when he returned home the next day.

Early on April 4, 2020, Defendant returned from work to his home in Columbia. Defendant was feeling sick and was afraid he had contracted COVID-19, so he stayed in a tent in the front yard. He set up a campsite near the trees in the yard. Defendant's sister stayed in a hammock at the campsite.[2]

As everyone was getting ready for bed that evening, the victim's mother told the victim to lock the doors so Defendant could not come inside the house. The victim's mother double-checked the doors herself, locked the screen door, and then went downstairs to the basement. The victim's father and brother were already asleep when the victim's mother came downstairs.

The victim received a text message from Defendant as she got ready for bed asking her to bring him a pillow and a blanket. He asked her to put them on the back porch swing so he could retrieve them. The victim complied. When she went out the back door, she did not see anyone because it was dark and the porch light was not working.

---

[1] It is the policy of this Court to protect victims of sexual offenses by using their initials.

[2] Defendant's sister testified for the defense at trial and said that she fell asleep before the rape occurred and remained asleep through the encounter.

As the victim set the pillow and blanket on the swing, she was attacked. She could not tell at first who was attacking her because the attacker grabbed her from behind by her arms. The victim's head was "slammed" onto the porch swing's arm rail. The victim recalled at trial that it hurt her forehead and under her right eye. At this point, the victim realized that it was Defendant attacking her. The victim was scared and told Defendant to stop.

Defendant held the victim's arms behind her back with one hand. She tried to free herself but could not because Defendant was "very strong." Defendant pulled down the victim's pajama bottoms with his other hand and inserted his penis into her vagina. The victim continued to tell Defendant to stop. Defendant told her, "You deserve this," and, "I know this hurts." The victim recalled at trial that the intercourse was painful "because he was being very rough" and did not use any kind of lubricant. At some point during the incident, which lasted around five minutes, Defendant penetrated her anus with his penis. The victim tried to fight him off but could not. The victim recalled at trial that she was very scared and thought she was going to die. The incident ended with Defendant ejaculating in the victim's anus. After the victim ran inside the house, Defendant began saying, "[Y]ou set me up. You set me up." The victim testified at trial that Defendant used force to rape her and that she did not consent to vaginal or anal sexual intercourse that evening. The victim insisted at trial that she did not fabricate the rape as a means of obtaining an advantage in their divorce proceedings or to take their children away from Defendant.

The victim's mother lay awake for 30 or 40 minutes and then heard "a loud noise[,]" "almost like something metal being scooted really hard or pushed up against the house." She "jumped up" and went upstairs. She noticed that the victim was not in her bed. The victim's mother saw that the back door was "cracked just a little bit." As she reached for the door, the victim ran in, crying. The victim's mother testified at trial that the victim had marks on her face and arms. Defendant stood on the back porch "throwing his arms in the air" and saying, "You made me do this." The victim told her mother that Defendant had attacked her from behind, held her arms down, and raped her. The victim's mother recalled at trial that the victim was "really distraught" and had a knot on her forehead. The victim's mother told the victim to call 911 and awoke the victim's father.

Maury County Sheriff's Office ("MCSO") Deputy Nicholas Pett was the first officer to arrive at the scene after the victim called 911. As Deputy Pett pulled up to the house, the first person he saw was Defendant, who was sitting in a lawn chair in the driveway about 20 yards from the house. Defendant told Deputy Pett that he and the victim had been text messaging "about having rough sex." Defendant told Deputy Pett that the victim invited him into the house, they went into the bedroom, and had sexual intercourse.

Defendant told Deputy Pett that the victim began to say that he raped her. Defendant told Deputy Pett that the victim had "set him up," and he started yelling. He said the victim's mother came into the bedroom and yelled at him, telling him to "get out." Deputy Pett left another deputy with Defendant and went up to the house to speak with the victim.

The victim appeared to Deputy Pett to be "extremely distraught [and] really upset. [She w]as kind of scared, shaken up." Deputy Pett initially did not see any marks on the victim, but after he shone a light on the victim, noticed redness on her head around her right eye and what appeared to be fingernail marks on her arm. Photographs of the victim taken at the house that evening were admitted as exhibits at trial. The victim was taken to Maury Regional Medical Center. When Deputy Pett spoke with the victim's mother, her version of events aligned with the victim's. The victim's mother told Deputy Pett that Defendant struck her shoulder with "a closed fist."

Defendant testified on his own behalf at trial and relayed a different version of events. He claimed that when he returned to his home in Columbia, he and the victim made plans for "makeup[] slash[] birthday sex." However, Defendant stated he expressed hesitancy about their plans because he was afraid he had COVID-19, which he said the victim thought was "silly." Regarding the victim's and his marital problems, Defendant testified at trial that he was under the impression that he and the victim were about to start marriage counseling.

Defendant said that he and the victim agreed to meet at the picnic table in their back yard to have sex. Defendant said the victim texted him to "stay hidden" because she did not want her parents to see them. According to Defendant, the victim asked him "to play rough like [they] used to." Defendant explained that they had used sex toys and restraints in the past. Defendant claimed that he waited for the victim to come outside and saw her standing in the doorway talking to someone for several minutes. He said the victim came down to the picnic table. Defendant confirmed that they engaged in vaginal and anal intercourse. Defendant claimed that the two had a "safe word" to indicate that the other party needed to stop, and the victim did not use it that night. Defendant maintained that he and the victim had consensual sexual intercourse. Defendant accused the victim of fabricating the rape and destroying evidence to obtain an advantage in their divorce proceedings and to take their children from him.

Defendant was taken into custody that evening and was released on bond. One of his bond conditions was that he could not contact the victim or her mother. A certified copy of Defendant's bond conditions was admitted as an exhibit at trial. Thereafter, an order of protection was granted that forbade Defendant from contacting the victim, his children, or the vicitm's mother; the orders were admitted as exhibits at trial. Defendant

repeatedly contacted the victim via text message and other means.  Defendant also texted the vicitm's mother, saying she would "burn in hell" for "lying."

The below chart reflects the charges and subsequent results from the 18-count indictment against Defendant by the Maury County Grand Jury.

| Count | Charge | Result |
|---|---|---|
| 1 | Rape by force or coercion against J.M. | Convicted |
| 2 | Domestic assault against J.M. | Convicted |
| 3 | Domestic assault against J.M.'s mother | Acquitted |
| 4 | Violation of an order of protection by contacting J.M. on April 7, 2020 via text message | Acquitted |
| 5 | Violation of a no-contact order by contacting J.M. on April 16, 2020 via text message | Convicted |
| 6 | Violation of an order of protection by contacting J.M. on April 16, 2020 via text message | Convicted |
| 7 | Violation of an order of protection by contacting J.M. on April 20, 2020 via mail | Pled guilty before trial |
| 8 | Violation of a no-contact order by contacting J.M. on May 7, 2020 via text message | Convicted |
| 9 | Violation of a no-contact order by contacting J.M. on May 8, 2020 via a messaging app | Acquitted |
| 10 | Violation of a no-contact order by making indirect contact with J.M. on April | Dismissed at close of State's proof |

| | | |
|---|---|---|
| | 5, 2020 through Michael Chapman | |
| 11 | Violation of a no-contact order by contacting J.M. on June 9, 2020 via text message through a text now app | Pled guilty before trial |
| 12 | Violation of a no-contact order by contacting J.M. on June 9, 2020 via text message through a text now app | Pled guilty before trial |
| 13 | Violation of a no-contact order by contacting J.M.'s mother on June 9, 2020 via text message | Convicted |
| 14 | Violation of an order of protection by contacting J.M.'s mother on June 9, 2020 via text message | Convicted |
| 15 | Violation of an order of protection by contacting J.M. on June 10, 2020 via text message through a text now app | Acquitted |
| 16 | Violation of an order of protection by contacting J.M. on June 11, 2020 via text message through a text now app | Acquitted |
| 17 | Violation of an order of protection by contacting J.M. on June 11, 2020 via text message through a text now app | Acquitted |
| 18 | Violation of a no-contact order by contacting J.M. on June 11, 2020 via text message through a text now app | Acquitted |

The jury convicted Defendant of rape, domestic assault against J.M., three counts of violating a no-contact order, and one count of violating an order of protection as reflected in the above chart. Also, as reflected in the chart, Defendant pled guilty before trial to one count of violating an order of protection and two counts of violating a no-contact order.[3]

After a sentencing hearing, the trial court sentenced Defendant to ten years' incarceration for rape and 11 months, 29 days on the remaining charges, all to run concurrently. The trial court denied Defendant's motion for new trial, and Defendant appeals.

## *Analysis*

Defendant argues on appeal that the trial court committed plain error in constructively amending the indictment to charge rape by lack of consent. He does not challenge any other conviction. Defendant also argues that the trial court erred in denying alternative sentencing. We address each issue in turn.

### *Constructive Amendment of the Indictment*

Defendant argues that the trial court constructively amended the indictment by instructing the jury on rape by lack of consent when the indictment charged only rape by force or coercion. Defendant concedes that this issue was not raised at trial and that our review is therefore limited only to plain error. The State argues that Defendant has not met his burden of establishing plain error because the evidence was sufficient to support a conviction for rape by force or coercion and consideration of this issue is therefore not necessary to do substantial justice.

Plain error relief is appropriate when:

(a) the record clearly establishes what occurred in the trial court; (b) a clear and unequivocal rule of law has been breached; (c) a substantial right of the accused has been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice."

*State v. Martin*, 505 S.W.3d 492, 504 (Tenn. 2016) (citations omitted); *see also* Tenn. R. App. P. 36(b). "[T]he presence of all five factors must be established by the record before

---

[3] The chart here is numbered according to the indictment. After Defendant pled guilty to three charges and one was dismissed at the close of the State's proof, the trial court renumbered the remaining counts before submitting the indictment to the jury.

this Court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." *Martin*, 505 S.W.3d at 504 (quoting *State v. Smith*, 24 S.W.3d 274, 283 (Tenn. 2000)). "If any one of these factors is not satisfied, we need not consider the remaining factors." *Martin*, 505 S.W.3d at 505 (quoting *State v. Smith*, 492 S.W.3d 224, 232-33 (Tenn. 2016)).

An accused has a constitutional right to be informed of the nature and cause of the accusation against him. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. An indictment must provide notice of the offense charged, adequate grounds upon which a proper judgment may be entered, and suitable protection against double jeopardy. *See* T.C.A. § 40-13-202; *State v. Hill*, 954 S.W.2d 725, 727 (Tenn. 1997). "Because an accused in a criminal prosecution has a right to fair and reasonable notice of the charges against which he must defend, 'the accused may be convicted only of a crime [that] is raised by the indictment or [that] is a lesser-included offense thereof.'" *State v. Myers*, 581 S.W.3d 173, 180 (Tenn. 2019) (quoting *State v. Rush*, 50 S.W.3d 424, 427 (Tenn. 2001)). "'[A] court cannot permit a defendant to be tried on charges that are not made in the indictment against him.'" *Myers*, 581 S.W.3d at 182 (quoting *Stirone v. United States*, 361 U.S. 212, 217 (1960)).

"[A] constructive amendment of the indictment occurs 'when the jury is permitted to convict the defendant upon a factual basis that effectively modifies an essential element of the offense charged.'" *State v. Edwards*, No. E2019-02176-CCA-R3-CD, 2021 WL 2554217, at *16 (Tenn. Crim. App. June 22, 2021) (quoting *State v. Goodson*, 77 S.W.3d 240, 244 (Tenn. Crim. App. 2001)), *perm. app. denied* (Tenn. Nov. 17, 2021). Reversal is automatic when a constructive amendment occurs "because the defendant may have been convicted on a ground not charged in the indictment." *Goodson*, 77 S.W.3d at 244. "Put simply, not only must the government prove the crime it charges, it must charge the crime it proves." *Id.* (quoting 41 Am. Jur. 2d *Indictments and Informations* § 258 (1995)).

The indictment here charged Defendant with rape by force or coercion. *See* T.C.A. § 39-13-503(1). The State had to prove at trial that (1) Defendant committed unlawful sexual penetration against J.M., (2) accomplished by the use of force or coercion, and (3) that Defendant acted intentionally, knowingly, or recklessly. *See id.* Criminal defendants have a constitutional right to complete and accurate jury instructions on the law. *State v. Benson*, 600 S.W.3d 896, 902 (Tenn. 2020). The indictment here did not charge rape by lack of consent. *See* T.C.A. § 39-13-503(2). Nevertheless, the trial court instructed the jury as follows:

Any person who commits the offense of rape is guilty of a crime.

For you to find the defendant guilty of this offense, the [S]tate must have proven beyond a reasonable doubt the existence of the following essential elements:

(1) that the defendant had unlawful sexual penetration of the alleged victim or the alleged victim had unlawful sexual penetration of the defendant;

and

(2)    (a) that force or coercion was used to accomplish the act;

         or[4]

         (b) that the sexual penetration was accomplished without the consent of the alleged victim and the defendant knew, or had reason to know, at the time of the penetration that the alleged victim did not consent[];

and

(3) that the defendant acted either intentionally, knowingly, or recklessly.

The jury foreman checked on the verdict form the box that said, "We, the Jury, find the defendant guilty of rape."

We find that the record clearly establishes what occurred in the trial court and that the trial court breached a clear and unequivocal rule of law with respect to this issue. Defendant was indicted for rape by force or coercion, and the trial court instructed the jury that it could find Defendant guilty of rape if it found that the unlawful sexual penetration was accomplished by force or coercion *or/and* that the victim did not consent. The jury was therefore permitted to convict Defendant under a mode of liability not charged in the indictment. Conviction of an offense not charged in the indictment adversely affects a substantial right of the accused because a constructively amended indictment does not provide notice of the charged offense, adequate grounds upon which to enter judgment, or suitable protection against double jeopardy. *See Goodson*, 77 S.W.3d at 244. There is no evidence in the record to suggest that Defendant waived this issue for tactical reasons. Finally, we find consideration of this error necessary to do substantial justice because we cannot conclude beyond a reasonable doubt that the jury's verdict was unanimous. To be sure, all the jurors concluded beyond a reasonable doubt that Defendant was guilty of rape,

_____

[4] Inconsistent with the written charge provided to the jury, the trial court used the conjunction "and" in its oral charge.

but it was possible, based on the jury instructions, that some jurors found that Defendant committed the rape by force or coercion, and others thought it was due to lack of consent. As Defendant points out, this is akin to an election problem because we cannot be sure the jurors unanimously convicted Defendant based on the mode of liability alleged in the indictment. *Cf. State v. Kendrick*, 38 S.W.3d 566, 568-70 (Tenn. 2001).

In so concluding, we have not overlooked the State's argument that consideration of this issue is not necessary to do substantial justice because the evidence was sufficient to convict under either rape by force or coercion or lack of consent. We agree with the State that the evidence is sufficient to support a conviction under either theory. However, that is not the proper lens through which we view these issues. *See State v. Hawkins*, 519 S.W.3d 1, 37 (Tenn. 2017) ("[A]n appellate court's task when evaluating the effect of a non-structural constitutional error is to ascertain the actual basis for the jury's verdict. This task requires more than evaluating the sufficiency of the evidence to support the conviction, and it does not turn on the appellate court's belief about the correctness of the jury's verdict."), *overruled on other grounds by State v. Enix*, 653 S.W.3d 692 (Tenn. 2022); *see also State v. Shelton*, 851 S.W.2d 134, 138 (Tenn. 1993) ("[A]n appellate court's finding that the evidence is sufficient to support convictions for any of the offenses in evidence is an inadequate substitute for a jury's deliberation over identified offenses."). We recognize that "[i]n most rape cases, the 'lack of consent' element is associated with the victim being forced or coerced into the sexual acts," *State v. Mitchell*, No. 1996-00008-CCA-R3-CD, 1999 WL 559930, at *6 (Tenn. Crim. App. July 30, 1999), *no perm. app. filed*, and that "[a]ll of the sexual assault crimes contemplate the lack of effective consent by the victim." *State v. Ealey*, 959 S.W.2d 605, 611 (Tenn. Crim. App. 1997). However, we cannot overlook that the General Assembly has created distinct modes of liability for rape*, see* T.C.A. § 39-13-503(1)-(4), and Defendant was indicted here only for rape by force or coercion.

Because Defendant has carried his burden as to all five factors for plain error relief, we must vacate Defendant's rape conviction and remand for a new trial on this count of the indictment.

### *Denial of Alternative Sentencing*

Though we vacate Defendant's conviction for rape, we address the trial court's denial of alternative sentencing as to his misdemeanor convictions. We review the manner of service of a sentence for abuse of discretion with a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). This framework applies to "all sentencing decisions," *State v. King*, 432 S.W.3d 316, 324 (Tenn. 2014) (citing *State v. Pollard*, 432 S.W.3d 851, 864 (Tenn. 2013)), including misdemeanor sentencing. *See State v. Hampton*, No. W2018-00623-CCA-R3-CD, 2019 WL 1167807, at *12 (Tenn. Crim. App. Mar. 12,

2019), *no perm. app. filed*. Trial courts are vested with considerable latitude in misdemeanor sentencing. *State v. Johnson*, 15 S.W.3d 515, 518 (Tenn. Crim. App. 1999). The "trial court need only consider the principles of sentencing and enhancement and mitigating factors in order to comply with the legislative mandates of the misdemeanor sentencing statute." *State v. Troutman*, 979 S.W.2d 271, 274 (Tenn. 1998); *see* T.C.A. § 40-35-302.

Here, the trial court thoroughly weighed the required factors in fashioning its sentence, including enhancement and mitigating factors. The trial court ultimately concluded that Defendant was not suitable for probation because he was not amenable to correction, pointing to his repeated disobedience of court orders that he not contact J.M. or her mother. The trial court also noted that Defendant refused to accept responsibility or acknowledge any wrongdoing. The trial court did not abuse its discretion in denying alternative sentencing. Defendant is not entitled to relief on this issue.

*Correction of Judgment Forms*

Our review of the judgment forms reveals corrections that should be made on remand. As noted above, the numbering of the judgment forms differs from the numbering of the indictment because the trial court renumbered the indictment after Defendant pled guilty to three counts and one count was dismissed. The judgment forms show that Defendant pled guilty to four charges: three counts of violating an order of protection and one count of violating a no-contact order. The record, however, indicates that Defendant pled guilty only to three charges: two counts of violating a no-contact order, and one count of violating an order of protection. The record further indicates that one count of violating a no-contact order was dismissed by the State after the close of its proof. On remand, the trial court should enter a corrected judgment form for judgment form number 16 (original Count 10) that reflects that the count of violation of a no-contact order was dismissed, and a corrected judgment form for judgment form number 17 that reflects that Defendant pled guilty to one count of violation of a no-contact order.

**CONCLUSION**

Based on the foregoing, we vacate Defendant's conviction for rape and remand this matter to the trial court for a new trial on that count of the indictment and for entry of corrected judgment forms as outlined above.

_____
TIMOTHY L. EASTER, JUDGE